IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL ROMERO                        :

    Plaintiff,                         :

    v.                                 :   Civil Action No. DKC 20-0366

RN JOHNSON O. OGUNSOLA,               :
RN CARLIN LEBRETON,                   :
RN KIRSTEN H. STEWART,
WEXFORD HEALTH SOURCES, INC.,         :
DR. ABAWI,
UNIVERSITY OF MARYLAND MEDICAL        :
  CENTER-KERNAN,
                                      :
  Defendants.

**MEMORANDUM OPINION**

Defendants Wexford Health Sources, Inc., Johnson O. Ogunsula, Carlin Lebreton, RN, and Kirsten H. Stewart, RN,[1] (collectively, "Wexford Defendants") filed a motion to dismiss or in the alternative for summary judgment (ECF No. 19) in response to the complaint filed by Plaintiff Michael Romero pursuant to 42 U.S.C. § 1983. Mr. Romero opposed the motion. (ECF No. 21). Defendants replied. (ECF No. 22). The matters pending are fully briefed and there is no need for an evidentiary hearing. *See* Local Rule 105.6. For the reasons below, the motion to dismiss or for summary judgment, construed as a motion for summary judgment, shall be

---

[1] The Clerk will be directed to correct the spelling of Defendants' names on the docket.

granted and the complaint as to the remaining Defendants shall be dismissed.

## I. Background

Plaintiff Michael Romero is an inmate committed to the custody of the Maryland Division of Correction. At all times relevant to the complaint, he was confined at Jessup Correctional Institution ("JCI"), in Jessup, Maryland.[2]

### A. August 2, 2017

Mr. Romero's complaint concerns treatment for an injury he sustained to his right foot and ankle on August 2, 2017, while he was walking down the stairs, began to fall, and "caught himself." (ECF No. 1, at 4). After nearly falling down the stairs, Mr. Romero went to the medical unit to get his prescribed medication and, while he was there, asked if he could be seen on an emergency basis for what he describes as severe pain and swelling to his right foot and ankle. (*Id.*, at 4-5). In response to his request, Defendant Johnson Ogunsula, RN, examined Mr. Romero's foot and ankle, put muscle rub and an ace bandage on the area, and gave him a blank sick call request form to submit if his symptoms worsened. (*Id.*, at 5). Neither a referral for provider follow-up, nor a request for an x-ray was submitted for Mr. Romero. (*Id.*).

---

[2] Mr. Romero is now confined at North Branch Correctional Institution in Cumberland, Maryland. (ECF No. 24).

2

The Wexford Defendants do not dispute that Mr. Romero injured his right foot on August 2, 2017, when he was descending the stairs. (ECF No. 19-5, at 2) (Declaration of Dr. Temesgen, Regional Medical Direction for Jessup region). At that time, Mr. Romero reported his pain as a "3" on a scale of 10. (*Id.*). Mr. Romero's foot and ankle were described as slightly swollen, which subsided when ice was applied. (*Id.*). Mr. Romero was advised by Nurse Ogunsula to continue applying cold compresses, gently rub with muscle rub, wrap with an ace bandage which was provided, and keep his foot elevated. (*Id.*); (ECF No. 19-4, at 3-4). Mr. Romero was provided with a blank sick call form to use if his symptoms worsened. (*Id.*). At the time, Mr. Romero was already prescribed Tramadol 50 mg and Neurontin 300 mg for chronic pain. (*Id.*). Because Mr. Romero was able to walk on his foot and the cold compress improved the swelling, Nurse Ogunsula suspected Mr. Romero's ankle was sprained. (*Id.*). Dr. Temesgen opines that, given the presentation, there was no clinical indication that Mr. Romero needed to be referred to a provider at that time. (ECF No. 19-5, at 3).

B.   August 4, 2017

According to Plaintiff, by August 4, 2017, his injury had worsened. (ECF No. 1, at 5). Specifically, his ankle was swollen to the size of a basketball and he could not walk. (*Id.*). He showed his ankle to correctional officers who obtained a wheelchair

3

to transport him to be seen by medical personnel for emergency medical treatment.  (*Id.*).  Mr. Romero states that Defendants Carlin Lebreton and Kirsten Stewart, both of whom are registered nurses, refused to see him.  (*Id.*).  Mr. Romero persisted in his attempts to get medical attention and Ms. Lebreton and Ms. Stewart put in an x-ray request and entered a "feed-in" order.  (*Id.*).  Mr. Romero was concerned with this plan because August 4, 2017 was a Friday and if he accepted this plan, he would have had to wait several days in his cell for the x-ray. (*Id.*).  Mr. Romero believes he may have died had he done nothing more after Defendants Lebreton and Stewart forced him to leave the medical unit.  (*Id.*).

Defendants agree that, on August 4, 2017, Mr. Romero submitted a sick call complaining that his right foot was possibly fractured. (ECF No. 19-5, at 3); (ECF No. 19-4, at 5).  Mr. Romero was brought to sick call in a wheelchair and he was seen by Carlin Lebreton, RN.  (ECF No. 19-5, at 3).  At this time, Mr. Romero's foot was swollen from a point above his ankle down to his toes.  (*Id.*). Mr. Romero told Ms. Lebreton that he had continued to walk on the injured foot and described the pain as sharp. (*Id.*).  Ms. Lebreton noted that the swelling on the sole of Mr. Romero's foot was assessed as "1+" and the skin was slightly red but cool to the touch.  (*Id.*).  The capillary refill to Mr. Romero's foot and toes was normal and he was able to move all five of his toes.  (*Id.*). Mr. Romero was, however, unable to bear any weight on his foot.

4

Ms. Lebreton submitted an x-ray request for the right foot, placed Mr. Romero on feed-in status and ordered a wheelchair for his use. (*Id.*). She further advised Mr. Romero to elevate his foot when seated and to avoid standing for long periods of time. (*Id.*). Dr. Temesgen observes that because Mr. Romero reported he had continued to walk on the injured foot, the increased swelling and pain were not unusual. (*Id.*). Additionally, the normal capillary refill and Mr. Romero's ability to wiggle his toes were positive indications. (*Id.*). Dr. Temesgen views the care provided by Ms. Lebreton as appropriate given the circumstances. (*Id.*).

Mr. Romero was seen again in the dispensary later on the same day, this time by Kirsten Stewart, RN. (ECF No. 19-5, at 3-4). Ms. Stewart offered Mr. Romero Ibuprofen or Tylenol, but he declined because it upsets his stomach. (*Id.*). Physician's Assistant Wilson was notified of Mr. Romero's issues and ordered an x-ray. (*Id.*).

Mr. Romero returned a third time in the afternoon of August 4, 2017 and was seen by Nurse Practitioner Titilayo Otunuga. (ECF No. 19-5, at 4). At this time Mr. Romero reported his pain to be a 10 out of 10 and explained that most of his pain was in his big toe, the top of his right foot, and in the arch of his right foot. (*Id.*). Although Mr. Romero was already taking Tramadol, he reported it was ineffective in treating the pain in his foot. (*Id.*). Mr. Romero was told to rest the foot, apply ice twice a

day, and he was prescribed Tylenol #3 for pain. (*Id*.). An x-ray was not taken on August 4, 2017, because it was "not available." (*Id*.). Rather, the right foot was immobilized and Mr. Romero was told not to place any weight on it until the x-ray could be taken. (*Id*.). At this time, it was still suspected that Mr. Romero had sustained a sprain, but other abnormalities could not be ruled out. (*Id*., at 5).

    C.    <u>Hospital Trip</u>

Mr. Romero repeatedly states that he left the medical department in a wheelchair and sought out a "security supervisor" to obtain assistance in getting proper medical care for his swollen ankle. (ECF No. 1, at 5). When Mr. Romero encountered the Chief of Security, he explained his predicament and showed him his swollen right foot. (*Id.*). Upon seeing the state of Mr. Romero's right foot and ankle, the Chief of Security called the Chief Medical Provider, Dr. Ayoku Oketunji and told Mr. Romero to return to medical. (*Id*.). When Mr. Romero arrived back in the medical unit, Dr. Oketunji examined his "infected swollen right foot" and "immediately had [Mr. Romero] sent out 911 by ambulance to an outside hospital." (*Id*.). Mr. Romero was sent to University of Maryland Medical Center (UMMC) where it was determined that he had an infection of cellulitis in his right foot. (*Id*., at 6). The UMMC treatment staff could not determine if Mr. Romero's foot was

6

fractured because of the infection, which took three weeks to treat with intravenous antibiotics.  (*Id*.).

The trip to the hospital, however, did not occur on August 4.  Rather, according to the verified records provided by Wexford Defendants, an x-ray of Mr. Romero's right foot and ankle was taken on August 7, 2017.  (ECF No. 19-5, at 5).  The radiologist reported that no acute fracture could be seen on the x-rays.  (ECF No. 19-4, at 12-13) (x-ray report).  Nurse Practitioner Ttilayo Otunuga was unable to palpate the right pedal or popliteal pulse due to the increased swelling.  (ECF No. 19-5, at 5); *see also* (ECF No. 19-4, at 14).  Compartment syndrome[3] could not be ruled out.  (*Id*.).  NP Otunuga contacted Dr. Atnafu to discuss Mr. Romero's case and Dr. Atnafu recommended sending Mr. Romero to UMMC emergency.  (*Id*.).  Mr. Romero was admitted to UMMC where he was treated for cellulitis and diagnosed with a midfoot or Lisfranc fracture.  (*Id*.); *see also (*ECF No. 19-4, at 17-33) (UMMC medical records noting date of admission as August 7, 2017).  There was no recommendation for surgery, therefore a cast was placed on Mr. Romero's right foot and ankle.  (*Id*.); *see also* (ECF No. 19-4, at 63).

---

[3] Compartment syndrome is a serious condition that involves increased pressure in a muscle compartment.  It can lead to muscle and nerve damage and problems with blood flow.  *See* https://medlineplus.gov (last viewed Oct. 20, 2020).

7

After the infection in Mr. Romero's foot had cleared, it was determined that he had sustained three fractures to his foot which required immobilization with a hard cast for approximately six weeks. (*Id.*). On August 12, 2017, Mr. Romero returned to the JCI infirmary where he remained on a PICC line for IV infusion of Vancomycin antibiotics through mid-September 2017. (ECF No. 19-5, at 5). The IV was stopped after Dr. Wolde-Rafael, the infectious disease specialist, determined the cellulitis had resolved. (*Id.*). Mr. Romero returned to UMMC for a follow-up to remove his cast. (*Id.*). Mr. Romero was approved for receipt of physical therapy at UMMC and was recommended for orthotic footwear to improve stability of his right foot and ankle. (*Id.*, at 5-6). He was cleared to return to general population at the end of November 2017. (*Id.*).

## II. Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Importantly, "the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The court maintains an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" (*Id.*) (quoting Fed. R. Civ. P. 56(e)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 249-50.

**III. Eighth Amendment**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*,

9

825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Kingsley*, 877 F.3d at 543. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839, 840 (1994); *see also Kingsley*, 877 F.3d at 544. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Kingsley*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the

11

risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)); *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk).

Mr. Romero's claim against Wexford as the contractor providing medical care to prisoners in the Maryland Division of Correction is based on what he characterizes as a policy that resulted in denying him needed emergency care. (ECF No. 21, at 7-11). Specifically, he claims that the practice of requiring inmates to be screened by registered nurses before being seen by a mid-level provider or a physician amounts to deliberate indifference to a serious medical need. (*Id.*, at 11).

Mr. Romero relies on *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658 (1978), establishing municipal liability for constitutional violations proximately caused by a policy, custom, or practice. Municipal policy arises from written ordinances,

12

regulations, and statements of policy, (*id*. at 690); decisions by municipal policymakers, *Pembaur v. Cincinnati*, 475 U.S. 469, 482-83 (1986); and omissions by policymakers that show a "deliberate indifference" to the rights of citizens. *See Canton v. Harris*, 489 U.S. 378, 388 (1989). Whether the procedures in place for conducting triage of medical complaints presented to Wexford's staff constitute a "policy" for purposes of *Monell* liability need not be determined where, as here, there has been no resulting constitutional violation.

Mr. Romero claims that Defendants Wexford Health Sources ("Wexford"), Ogunsula, Lebreton, and Stewart are responsible for the lack of treatment and the delay in his receipt of emergency treatment for his "rare infection and fracture." (ECF No. 1, at 6). When Mr. Romero first reported his injury on August 2, 2017, he was able to walk, and the slight swelling subsided with application of a cold compress; he does not dispute this assessment of his injury. Additionally, Mr. Romero was already prescribed pain medications, which he continued to receive. Defendants do not dispute that Mr. Romero was not provided with any assistive devices on the day of his injury, nor do they dispute that Mr. Romero had to walk to the medical unit twice on August 2, 2017.

In his opposition to Defendants' motion, Mr. Romero asserts that on August 2, 2017, Nurse Ogunsula initially refused to examine his foot after he explained he had injured it. (ECF No. 21-1, at

13

2). Mr. Romero asked Nurse Ogunsula to refer him to a provider, meaning a physician or a physician's assistant, and said he needed to have his foot x-rayed. (*Id.*). Despite Mr. Romero's requests, Nurse Ogunsula failed to refer him to a provider and did not order x-rays. (*Id.*). Mr. Romero also points out that he was not provided with any sort of assistive device such as a cane or crutches, making it necessary for him to walk to retrieve his daily medications and exacerbating his injury. (*Id.*). Mr. Romero states that on August 3, 2017, he had to walk to medical twice to get his pain medication. (*Id.*, at 3.). He estimates the distance to be 300 to 400 yards in one direction. (*Id.*, at 4). Mr. Romero claims that by August 4, 2017, his right foot and ankle were so swollen that he could not touch his foot to the floor and had to hop out of his cell, down the stairs, and to the rec hall to ask another inmate to request some assistance for him from correctional officers. (*Id.*, at 2).

While Defendants acknowledge that the increase in swelling to Mr. Romero's foot that was noted the following day was probably due to the fact that he continued to walk on it, they do not suggest that Mr. Romero had alternative means to transport himself to the medical unit. Mr. Romero does not allege, however, that he made Defendants aware of the fact that walking on his foot on the day following his injury was causing him pain. It is also undisputed that when the symptoms worsened on August 4, 2017, Mr.

14

Romero was given a wheelchair and was told to keep his foot elevated. Later that day, Mr. Romero was given Tylenol #3 twice per day, his foot was immobilized, and he was told to avoid putting weight on his foot.

The parties dispute the date Mr. Romero was sent out of the prison to UMMC. While Mr. Romero maintains that he was sent to the hospital on August 4, 2017, because he insisted it was necessary, the verified medical record from UMMC indicates that Mr. Romero was sent there on August 7, 2017. (ECF No. 19-4, at 17-33). Mr. Romero also claims his foot was x-rayed on August 4, 2017; however, the x-ray report, which is included with the verified medical records, indicates it was taken on August 7, 2017. (ECF No. 19-4, at 13). Mr. Romero's assertions, without more, are not enough to create a genuine dispute of material fact in light of the verified medical records from records kept by both Wexford and UMMC. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). Indeed, Mr. Romero relies on a medical record dated August 23, 2017, which states in pertinent part that he was sent to UMMC on August 7, 2017. (ECF No. 21-1, at 16).

The care provided was tailored to the ongoing development of worsening symptoms Mr. Romero exhibited. Mr. Romero's assertion

15

that his foot should have been x-rayed on the date of the injury represents a disagreement with the medical care provided. Such disagreement does not amount to a deprivation of a constitutional right absent exceptional circumstances not present here. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Further, there is no objective evidence that an earlier x-ray would have revealed a fracture when an x-ray performed on August 7, 2017, did not.

The fact that Wexford Defendants did not diagnose Mr. Romero with cellulitis or a fractured foot is, at most, medical malpractice. "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked symptoms with the presence of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge). Here, there is no evidence that Wexford Defendants treated Mr. Romero with reckless disregard for his well-being, nor is there any evidence that they refused to provide appropriate medical care for an ongoing, developing serious medical need. Rather, Mr. Romero's condition was monitored and addressed as the symptoms became more serious.

**IV. Supplemental Complaint:  Medical Malpractice Claims**

In a supplemental complaint asserting supplemental jurisdiction, Mr. Romero has also raised medical malpractice claims against Dr. Abawi and the University of Maryland Medical Center-Kernan because his big toe did not set correctly and causes him an ongoing source of pain while walking.  (ECF No. 12).  Mr. Romero claims that these defendants are responsible for his current state of disability.  (ECF No. 1, at 6).  Mr. Romero claims that his big toe did not "set right" and he was never advised of this by Dr. Abawi.  (*Id.*).  He found out about his toe when he was taken to another specialist for a consult about his knee.  Dr. Krishnaswamy at Bon Secours Hospital x-rayed Mr. Romero's right foot and advised that in order to fix his right big toe, it would need to be broken and reset.  (*Id.*).

Mr. Romero takes issue with the fact that Dr. Abawi did not tell him about his big toe.  (*Id.*).  When Mr. Romero confronted her with the issue, Dr. Abawi advised that she did not think it would affect him.  (*Id.*, at 7).  Mr. Romero told Dr. Abawi that he could not walk on his right foot because of "the big toe bone sticking out under his right foot."  (*Id.*).  In an effort to address the problem with his toe, Dr. Abawi ordered special orthopedic shoes which did not correct the problem.  (*Id.*).  Mr. Romero claims that Dr. Abawi was going to perform corrective surgery to reset his toe, but before the surgical procedure could

be done Mr. Romero was advised by Wexford employees that "no prisoner can go to or be treated by anyone at University of Maryland Rehabilitation and Orthopedic Institute-Kernan." (*Id*.). The failure to provide Mr. Romero with the corrective surgery has resulted in continued pain and an inability to walk more than short periods of time. (*Id*.). Mr. Romero alleges medical malpractice against Dr. Abawi and University of Maryland Rehabilitation and Orthopedic Institute-Kernan. (*See* ECF No. 12) (supplemental complaint).

Medical malpractice is a state law claim.[4] "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-727 (1966)). The complaint as to these Defendants shall be dismissed without prejudice.

---

[4] Under Maryland law, if a medical malpractice claim is filed in a State Circuit Court due to the amount of damages sought (over $30,000), the plaintiff must comply with Md. Code Ann., Cts & Jud. Proc. § 3-2A-02, which requires in pertinent part that the plaintiff obtain a certificate from an expert stating that the care provided did not meet the accepted standard of care. *See also* Md. Code Ann., Cts & Jud. Proc. § 3-2A-05 (Arbitration Proceedings).

## V. Conclusion

By separate Order which follows, the pending motion to dismiss or for summary judgment, construed as a motion for summary judgment, shall be granted and the complaint as to the remaining Defendants shall be dismissed.

                                    /s/
                            DEBORAH K. CHASANOW
                            United States District Judge